## UNITED STATES DISTRICT OCURT
## DISTRICT OF MINNESOTA

Tyler M. J.,                                              Case No. 18-cv-537 (JRT/TNL)

       Plaintiff,

v.                                                                  **REPORT &**
                                                                    **RECOMMENDATION**

Nancy A. Berryhill,
Acting Commissioner of Social Security,

       Defendant.

Stephanie M. Balmer, Falsani, Balmer, Peterson & Balmer, 1200 Alworth Building, 306 West Superior Street, Duluth, MN 55802-1800 (for Plaintiff); and

Kizuwanda Curtis, Special Assistant United States Attorney, Assistant Regional Counsel, Social Security Administration, 1301 Young Street, Suite A702, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Tyler M. J. brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment (ECF No. 11) and the Commissioner's Motion for Summary Judgment (ECF No. 13). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable John R. Tunheim, Chief District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **DENIED** and the Commissioner's Motion for Summary Judgment (ECF No. 13) be **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in August 2014, asserting that he has been disabled since September 2012 due to the following conditions: "neck, back, arms/hands, headaches, bipolar, depression, [and] personality disorder." (Tr. 15, 82, 96, 97, 246, 260; *see also* Tr. 260.) Plaintiff's application for DIB was denied initially and again upon reconsideration. (Tr. 15, 94, 96, 111, 113; *see* Tr. 115-25.) Plaintiff appealed the reconsideration of his DIB determination by requesting a hearing before an administrative law judge ("ALJ"). (Tr. 15, 129-30; *see* Tr. 131-54.)

The ALJ held a hearing on March 7, 2017. (Tr. 15, 43, 45; *see* Tr. 155-85.) After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied his request for review. (Tr. 1-5, 12-39, 187-89.) Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.) The parties have filed cross motions for summary judgment. (ECF Nos. 11, 13.) This matter is fully briefed and ready for a determination on the papers.

## III. ANALYSIS

### A. Legal Standard

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

"Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.*  This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.*  The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Id.*; *accord Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012).  "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted).  Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability.  42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315.  An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a).  This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience.  42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

Plaintiff's arguments are directed at the ALJ's assessment of his residual functional capacity at step four. *See Perks*, 687 F.3d at 1092 (residual-functional-capacity determination occurs at step four). Plaintiff's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted). At the same time, a residual-functional-capacity determination must be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quotation omitted). And, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for

4

support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *see* 20 C.F.R. § 404.1546(c). "[T]he burden of persuasion to prove disability and demonstrate [residual functional capacity] remains on the claimant." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *accord Perks*, 687 F.3d at 1092.

Plaintiff asserts that the ALJ did not properly evaluate his mental impairments and the ALJ's determination that he was capable of performing light work with frequent bilateral overhead reaching is not supported by substantial evidence. The Court considers each argument in turn along with a discussion of the relevant medical evidence.

### B. Mental Impairments

#### 1. Medical Evidence

Plaintiff has a history of anxiety and bipolar disorders. (*See, e.g.*, Tr. 364, 395, 397, 399, 403, 407, 417-18, 558, 562, 768, 783, 820-23, 1326-27, 1556, 1564.) Plaintiff also has a history of depression. (*See, e.g.*, Tr. 558, 562, 730, 768, 783, 1326-27, 1556, 1562.)

Between 2011 and 2013, Plaintiff regularly saw the following treatment providers in connection with his bipolar and anxiety disorders: Therese M. Sundberg, RN, CNP, for psychotherapy and medication management; Michael M. Messer, MD, for medication management; and Paul Larkin, ACSW, LICSW, for psychotherapy. (*See, e.g.*, Tr. 721-23, 741-46, 751-54, 759-67, 772-780, 785-823.) Plaintiff was most frequently affected by his chronic pain. *See infra* Section III.C.1. (*See, e.g.*, Tr. 806, 808, 810, 821.) Plaintiff also expressed feelings of "hopelessness and helplessness," (Tr. 765; *see also* Tr. 730), and had difficulties coping, (*see, e.g.*, Tr. 743, 792, 778, 801, 804-05, 806, 822). Additionally,

Plaintiff's mental health was often complicated by financial and employment stressors. (*See, e.g.*, Tr. 730, 748, 755, 757, 775, 797, 799, 804, 818.)  Plaintiff was treated with several different medications, including lamotrigine[1], trazodone[2], Wellbutrin[3], quetiapine[4], sertraline[5], and hydroxyzine[6].  (*See, e.g.*, Tr. 743, 746, 777, 819, 822.)  Plaintiff's therapy sessions were largely focused on stress management, coping strategies, and pain management.  (*See, e.g.*, Tr. 780, 792-97, 804-05.)

Towards the end of 2012, Plaintiff began participating in an intensive outpatient partial program for adults, which he reported was "beneficial" and taught him "some ways to cope."  (Tr. 774; *see* Tr. 768-71, 772, 776; *see also* Tr. 781-84.)  Around the same time, Plaintiff's therapy sessions also focused on chemical-dependency issues, including use of heroin and "some self[-]medicating with [V]alium[7] and/or prescribed codeine and Lortab[8]."  (Tr. 774; *see, e.g.*, Tr. 759-60, 772-73.)  It appears that Plaintiff returned for

---

[1] Lamotrigine is "used to increase the time between episodes of depression, mania . . . , and other abnormal moods in patients with bipolar I disorder."  *Lamotrigine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a695007.html (last visited Jan. 3, 2019).

[2] "Trazodone is used to treat depression."  *Trazodone*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a681038.html (last visited Jan. 3, 2019).

[3] Wellbutrin is a brand name for bupropion, a medication "used to treat depression."  *Bupropion*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a695033 html (last visited Jan. 3, 2019).

[4] Quetiapine is "used alone or with other medications to treat episodes of mania . . . or depression in patients with bipolar disorder."  *Quetiapine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a698019 html (last visited Jan. 3, 2019).

[5] Sertraline is used to treat, among other things, panic attacks, and social anxiety disorder.  *Sertraline*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a697048.html (last visited Jan. 3, 2019). Sertraline is also known by the brand name Zoloft.  *Id.*

[6] Hydroxyzine is "used alone or with other medications in adults and children to relieve anxiety and tension." *Hydroxyzine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682866.html (last visited Jan. 3, 2019).

[7] *See infra* n.9.

[8] Lortab is a brand name for a combination of acetaminophen and hydrocodone, an opioid, and can be used to treat pain.  *Hydrocodone Combination Products*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a601006.html (last visited Jan. 3, 2019).

additional treatment through the intensive outpatient partial program on occasion in 2013 as well.  (*See, e.g.*, Tr. 712-14, 730-34, 747-50, 755-58.)

Plaintiff saw Larkin most frequently, roughly once per week July 2012 through February 2013, until he had a disagreement with Larkin over the focus on his "substance abuse issues."  (*See, e.g.*, Tr. 759-60, 772-75, 779-80, 785-93, 802-07; *see also* Tr. 756.) During this time, Larkin noted that Plaintiff's mood was generally even to "slightly deflated"; he was overall less anxious; and his speech was less pressured.  (*See, e.g.*, Tr. 775, 780, 786, 788, 792, 794, 796, 803, 805.)  Sundberg saw Plaintiff approximately once per year and noted that Plaintiff's mood was generally "euthymic," and his concentration and attention were within normal limits.  (*See, e.g.*, Tr. 762, 766, 800, 822.)

In June 2013, Plaintiff was admitted overnight "for concerns of suicidal ideation" after presenting to the emergency room with reports of "increased hopelessness with worsening anxiety and sleep disturbance."  (Tr. 391; *accord* Tr. 397, 399, 400, 402; *see also* Tr. 539-41, 741, 744, 1114.)   Plaintiff reported "significant financial problems lately[]as well as some relationship discord with his parents, who[m] he continues to live with."  (Tr. 392; *accord* Tr. 397, 402, 403-04.)  "After an extensive initial interview, it was determined that [Plaintiff] was abusing his diazepam[9], which results in him going without the medication and experiencing withdrawal."  (Tr. 392; *see* Tr. 402, 403-04.)  Plaintiff was also confronted about his marijuana use, which he admitted to "smok[ing] on at least a daily basis."  (Tr. 392; *accord* Tr. 402.)

---

[9] "Diazepam is used to relieve anxiety, muscle spasms, and seizures and to control agitation caused by alcohol withdrawal."  *Diazepam*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682047 html (last visited Jan. 3, 2019).  Valium is a brand name for diazepam.  *Id.*

Plaintiff's mood was noted to be "[d]epressed, irritable and anxious." (Tr. 392; *see* Tr. 404.) Plaintiff's judgment was "impaired by substance abuse"; his abilities to reason and problem solve were "poor" and his insight into his "condition and situation [wa]s fair." (Tr. 392; *accord* Tr. 404.) Plaintiff was diagnosed with benzodiazepine abuse and withdrawal and bipolar disorder. (Tr. 393, 395, 399; *see* Tr. 404.) Plaintiff was discharged the following day with plans to follow up with his primary treatment providers for pain management and psychiatric care. (Tr. 393.)

During a diagnostic assessment in early October 2013, Plaintiff was noted to have "traits of Cluster B personality disorders," but diagnosis was deferred. (Tr. 732, 733.) Plaintiff was noted to be "experiencing an acute episode of depression that meets criteria for partial hospitalization," and was placed on a waiting list. (Tr. 733.)

Plaintiff presented to the emergency room again in October 2013 with suicidal thoughts which he attributed to "inadequate pain control." (Tr. 406; *accord* Tr. 414; *see* Tr. 933-38, 1100-06.) Plaintiff requested tramadol[10] but was refused, at which time he became "verbally abusive." (Tr. 407; *see* Tr. 412, 728.) This time, Plaintiff was admitted for three days. (Tr. 406.) Plaintiff reported that he was no longer taking opiates or diazepam. (Tr. 406-07.) Plaintiff had been "struggling to obtain insurance and was unable to afford his Lyrica[[11] prescription]," having not had it "for two weeks." (Tr. 407; *accord* Tr. 414, 417.) Plaintiff reported "experiencing a depressive episode up until about a week

---

[10] Tramadol is an opioid and "used to relieve moderate to moderately severe pain." *Tramadol*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a695011 html (last visited Jan. 3, 2019).

[11] Lyrica is a brand name for pregabalin, which is used to treat neuropathic pain. *Pregabalin*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a605045 html (last visited Jan. 3, 2019).

ago and has been struggling with insomnia[]as well as increased agitation and racing thoughts." (Tr. 407; *accord* Tr. 414.) It was also noted that Plaintiff was scheduled for psychological testing with Sundberg and a partial hospitalization program to address mood instability. (Tr. 407, 414.)

During his stay, Plaintiff "openly admitted . . . that he was not suicidal, but that he becomes tired of his chronic pain and this is very frustrating for him, and that he came to the hospital to get better pain control." (Tr. 412; *see also* Tr. 417, 1641.) Plaintiff was also "involved in a low speed fender bender" a couple of days earlier, which increased his neck pain. (Tr. 417; *see* Tr. 526-27.) While he was hospitalized, Plaintiff was given an increased dose of Lyrica "with the intention to help him manage his anxiety with the potential that may improve some of his radiating pain from his neck into his left arm." (Tr. 407; *see* Tr. 412.)

Plaintiff's mood was again "[d]epressed, irritable and anxious." (Tr. 407; *accord* Tr. 415.) His insight into his condition and situation was "limited" and his abilities to reason and problem solve were "fair." (Tr. 407; *accord* Tr. 410, 415.) While Plaintiff's affect was "[p]rimarily appropriate and variable," he also displayed "some inappropriate laughing when discussing the stress of the situation." (Tr. 407.) It was recommended that Plaintiff enroll in and complete a pain management program once he obtained insurance and follow up with psychological testing and the partial hospitalization program. (Tr. 408, 414; *see* Tr. 410, 412.)

Plaintiff participated in the adult partial hospitalization program from October 21 through November 8, 2013. (Tr. 701-07.) Plaintiff underwent psychological testing and

was diagnosed with depressive, anxiety, and personality disorders.  (Tr. 700, 703, 705.)
Sundberg also saw Plaintiff in connection with the program.  (Tr. 712-714.)  Sundberg
encouraged Plaintiff to increase his antidepressant medication to address his "low mood
and anxiety," but Plaintiff did "not wish to increase his dose."  (Tr. 714; *see also* Tr. 704.)

Plaintiff next saw Sundberg in mid-February 2014.  (Tr. 691.)  Plaintiff reported
that he was "doing well," and Sundberg noted that he had "made some remarkable changes
since last seen," including working two hours a day as a custodian and taking six credits at
a local college.  (Tr. 691-92.)  Plaintiff did not feel that his Zoloft[12] prescription was
effective, and Sundberg prescribed a trial of Cymbalta.[13]  (Tr. 692-93.)  At his next
appointment in September, Plaintiff reported that the duloxetine[14] was "working" and he
"would like an increase."  (Tr. 631.)  Plaintiff also wanted to decrease his bupropion[15].  (Tr.
631.)  Sundberg noted both of these requests were "reasonable" and adjusted Plaintiff's
prescriptions.  (Tr. 631, 633.)

Plaintiff began therapy with Elisabeth A. Molstad, MSW, LICSW, towards the end
of May 2014.  (Tr. 666-67.)  Plaintiff saw Molstad approximately once per month between
May and October.  (Tr. 611, 639, 640, 642, 651, 666.)  Plaintiff continued to experience
financial stress, difficulties coping, relationship challenges, and chemical-dependency
issues.  (*See, e.g.*, Tr. 611, 639-40, 642-43, 666, 651.)

---

[12] *See supra* n.5.
[13] Cymbalta is a brand name for duloxetine, a medication "used to treat depression and generalized anxiety disorder."  *Duloxetine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/ a604030 html (last visited Jan. 3, 2019).
[14] *See supra* n.13.
[15] *See supra* n.3.

Between mid-May 2015 and the end of the year, Plaintiff saw Todd A. Heggestad, LP, for psychotherapy nine times in connection with his "adjustment reaction with anxiety and depression." (*See, e.g.*, Tr. 1387, 1404, 1419, 1432, 1477, 1488, 1490, 1493, 1496; *see also* Tr. 1380-81, 1390-91.) Plaintiff's visits focused on the same recurring themes with respect to health and pain management, relationship issues, and struggles with chemical dependency. (*See, e.g.*, 1380, 1387, 1390, 1419, 1432, 1466, 1477, 1488, 1490, 1492, 1496.)

At the end of 2015, Plaintiff was hospitalized after attempting suicide following a confrontation with his parents over his medication use and "want[ing] him to move out." (Tr. 1367, 1694-1702; *see* Tr. 1368, 1373.)

Also towards the end of 2015, Plaintiff began to meet with Babuji R. Gandra, MBBS, for medication management and psychological treatment including electroconvulsive therapy. (*See, e.g.*, Tr. 1382-86, 1412-15; *see* Tr. 1292.) Plaintiff met with Gandra a handful of times. (*See, e.g.*, Tr. 1368, 1382-86, 1412-15.)

Plaintiff continued to regularly meet with Dr. Heggestad throughout 2016 with their sessions primarily focused on Plaintiff's chemical dependency and treatment. (*See, e.g.*, 1249, 1253-55, 1257-58, 1269, 1272-76, 1278-79, 1286, 1309, 1329, 1327, 1325, 1330, 1333, 1340, 1343-44, 1353, 1361, 1364, 1367, 1623, 1632, 1635; *see also* Tr. 1289-90, 1324-28.) During this time, Plaintiff was discharged from one treatment program, but entered and completed another residential treatment program. (*See, e.g.*, Tr. 1274-80, 1286.)

Plaintiff met with Sundberg twice in 2016 to review his medications, once in July and once in December. (Tr. 1246-48, 1292-95.) In December, Plaintiff reported that he was "doing better." (Tr. 1246.) Plaintiff was currently living at a boarding facility and hoped to move into a group home. (Tr. 1246.)

Plaintiff continued meeting with Dr. Heggestad in early 2017. (*See* Tr. 1603, 1615, 1618.) These sessions tended to focus on feelings of tiredness, a desire to be more involved at the boarding facility, and adjusting to living at the facility. (Tr. 1603, 1618; *see* Tr. 1616, 1632.) In mid-January, Dr. Heggestad described Plaintiff as "stable." (Tr. 1616.)

In February, Plaintiff had a medication management appointment with Sundberg. (Tr. 1606-08.) Plaintiff reported that he "wants some independence, but not full independence, in that he feels that he does need assistance in transport [sic] and activities of daily living." (Tr. 1607.) Sundberg noted that Plaintiff's "[m]ood and affect are generally euthymic"; "[s]peech is of normal rate and rhythm"; "[t]hought processes are logical and goal directed without evidence of disorder"; "[i]mmediate recall, recent memory and remote memory are intact"; "[i]nsight and judgment are intact"; and "[f]und of knowledge is average." (Tr. 1607-08.)

### 2. Opinion Evidence

#### a. Dr. Trulsen

In April 2015, Marlin Trulsen, PhD, LP, completed a consultative examination (Tr. 1225-30.) Plaintiff's diagnoses included pervasive developmental disorder, adjustment disorder with mixed anxiety and depressed mood, anxiety disorder, and dysthymic disorder. (Tr. 1228.) Dr. Trulsen opined that Plaintiff's

general mental capacity for understanding and remembering
appear adequate in development and appeared to demonstrate
occasions of slight impairment due to interference with current
mental health/cognitive difficulties.   His general mental
capacity for following instructions, sustaining attention, and
concentrating appear to demonstrate a slight to occasionally
moderate level of impairment due to inference with current
mental health and cognitive difficulties.  His general mental
capacity for car[ry]ing out work like tasks with reasonable
persistence and pace, responding appropriately to brief and
superficial contact with coworkers and supervisors, as well as
tolerating stress and pressures typically found in an entry-level
work place appear to demonstrate a moderate to occasionally
marked level of impairment due to interference with current
mental health/cognitive difficulties with the impairment level
likely to gradually diminish with familiarity and use of routine.

(Tr. 1228-29.)  Dr. Trulsen further opined that Plaintiff "appears capable of respecting

authority to an average level with no impairment."  (Tr. 1229.)  Plaintiff "demonstrated an

average ability to hear normal conversation and sustained speech, however, presented with

significant difficulties providing average conversation abilities due to excessively long and

increasingly detailed and unrelated information when responding to most questions."  (Tr.

1229.)

### b. Sundberg

In November 2016, Sundberg completed a Medical Source Statement.  (Tr. 1241-

1244.)   Sundberg listed Plaintiff's diagnosis as bipolar affective disorder with an

adjustment reaction.  (Tr. 1241.)  Sundberg did not opine on any functional limitations.

(Tr. 1242.)   Sundberg checked boxes indicating that Plaintiff has a "[m]edically

documented history of a chronic organic mental disorder of at least 2 years' duration that

has caused more than a minimal limitation of ability to do basic work activities, with

symptoms or signs currently attenuated by medication or psychosocial support," and has had "repeated episodes of decompensation, each of extended duration." (Tr. 1243.) Sundberg opined that Plaintiff would likely be absent more than four days per month and wrote "unknown" in response to whether Plaintiff would be "off task 25% or more of the time." (Tr. 1243.)

### c. Dr. Heggestad

In December 2016, Dr. Heggestad completed a Medical Source Statement listing depression, bipolar disorder, and borderline personality disorder among Plaintiff's diagnoses. (Tr. 1598.) Dr. Heggestad opined that, due to depression and chronic pain, Plaintiff was moderately limited in his ability to complete "a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without unreasonable . . . breaks." (Tr. 1599.) Plaintiff was otherwise not significantly limited.[16] (Tr. 1599.) Dr. Heggestad opined that Plaintiff would not be off-task more than 25% of the time, but he would be absent more than four days per month due to chronic pain. (Tr. 1600.)

Like Sundberg, Dr. Heggestad stated that Plaintiff had a medically documented history of a chronic mental disorder lasting for at least two years currently being treated with medication or psychosocial support, citing Plaintiff's depression, bipolar disorder, and borderline personality disorder. (Tr. 1600.) Dr. Heggestad noted one episode of decompensation based on Plaintiff's suicide attempt at the end of 2015. (Tr. 1600.)

---

[16] Dr. Heggestad did not opine on Plaintiff's abilities "to respond appropriately to changes in the work setting" and "travel in unfamiliar places and/or use public transportation." (Tr. 1599.)

14

Dr. Heggestad noted that "[d]epression [and] pain issues significantly affect [Plaintiff's] daily life function." (Tr. 1598.) While Plaintiff's "cognitive [and] social functioning would appear to be within normal limits[,] [e]motional [and] chronic pain symptoms do interfere with daily functioning." (Tr. 1599.) Dr. Heggestad additionally noted that Plaintiff's chronic cervical pain impacted his abilities to lift and reach. (Tr. 1601.) Plaintiff's pain also impacted his depression and caused "intermittent suicidal thinking." (Tr. 1601.)

### d. State Agency Psychological Consultants

The state agency psychological consultants opined that Plaintiff "retains sufficient mental capacity to concentrate on, understand, and remember routine, repetitive and 3-4 step uncomplicated instructions, but would be markedly impaired for detailed or complex/technical instructions." (Tr. 91; *accord* Tr. 108.) Further, his "ability to carry out routine, repetitive and 3-4 step tasks with adequate persistence and pace would not be significantly limited, but would be markedly limited for detailed or complex/technical tasks." (Tr. 91; *accord* Tr. 108.) With regard to Plaintiff's social abilities, Plaintiff's "ability to handle co-worker and public contact would be reduced but adequate to handle brief and superficial contact," and his "ability to tolerate and respond appropriately to supervision would be reduced but adequate to handle ordinary levels of supervision found in a customary work setting." (Tr. 92; *accord* Tr. 109.) Lastly, his "ability to handle stress and pressure in the work place would be reduced but adequate to handle the stresses of a routine repetitive or a 3-4 step work setting. It would not be adequate for the stresses of a detailed or complex work setting." (Tr. 92; *accord* Tr. 109.) One of the state agency

psychological consultants additionally noted that Plaintiff "is able to persist at lower level moderately complex tasks as noted above with reduced contact with others within physical limitations." (Tr. 109.)

### 3. Plaintiff's Testimony

At the hearing, Plaintiff testified that he currently lives in a boarding lodge. (Tr. 48-49.) Plaintiff testified that he volunteers in the kitchen, helping to serve and clean, for approximately one hour, which "helps with [his] depression." (Tr. 48.) Plaintiff testified that he was able to perform basic activities such as feeding himself and his own personal care. (Tr. 53, 73.) Plaintiff testified that he currently takes medication for his depression and anxiety which help with his conditions. (Tr. 60-61.) Plaintiff also testified that his anxiety can increase the tremors in his hands. (Tr. 71.) Plaintiff testified that he has good days and bad days. (Tr. 72.) On bad days, Plaintiff testified that he has hardly any appetite. (Tr. 72-73.)

When asked about his withdrawal from college courses, Plaintiff testified that it was draining on him physically and mentally and he would "get . . . more mentally exhausted . . . trying to do it all together." (Tr. 68.) Plaintiff also testified that he received certain accommodations, including being able to take tests at the time of his choosing. (Tr. 68.)

### 4. ALJ Decision

In relevant part, the ALJ found and concluded that Plaintiff's depression was a severe impairment that did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, when considered individually or in combination with other impairments. (Tr. 17-22.) The ALJ determined that Plaintiff was mildly limited in

16

his abilities to understand, remember, or apply information based on his self-reports about following written instructions better than spoken instructions, completing what he started, a varying capacity to pay attention depending on his mental state, attending to his own personal care, and needing to organize his medications. (Tr. 20; *see* Tr. 279, 282, 284.) The ALJ also cited psychological testing performed by Dr. Trulsen and Plaintiff's testimony during the hearing. (Tr. 20; *see* Tr. 1227.)

The ALJ found that Plaintiff had moderate limitation in his ability to interact with others. (Tr. 20-21.) The ALJ again cited Plaintiff's self-reports about spending time with others (including through video-game applications online), visiting a local gas station, and attending medical appointments. (Tr. 20; *see* Tr. 281, 283.) The ALJ noted Plaintiff's self-reports about needing reminders to attend medical appointments and being accompanied to appointments because he needs a ride. (Tr. 20; *see* Tr. 281, 283; *see also* Tr. 305.) The ALJ also noted that Plaintiff reported a history of difficulty getting along with others based on his mental health. (Tr. 20-21; *see* Tr. 284-85.) The ALJ pointed out that Plaintiff reported "spending time with his girlfriend, attending to his dog, listening to music and looking at eBay" when talking with Dr. Trulsen. (Tr. 20; *see* Tr. 1226.) Additionally, the ALJ relied on Plaintiff's testimony that he has good and bad days, and places in the record where Plaintiff reported having an adequate social life. (Tr. 20-21.)

The ALJ also found that Plaintiff had moderate limitation in his ability to maintain concentration, persistence, or pace. (Tr. 21.) Looking to Plaintiff's self-reporting, the ALJ noted that Plaintiff liked to go outside and drive, but sometimes did not drive due to a lack of insurance. (Tr. 21; *see* Tr. 281.) Plaintiff was able to go to the grocery store, pay bills,

count change, handle a savings account, and use a checkbook.  (Tr. 21; *see* Tr. 281.)  The ALJ also cited psychological testing conducted by Dr. Trulsen and Dr. Trulsen's opinions that Plaintiff had "slight to occasionally moderate levels of limitations to follow instructions sustain attention, and concentrate," and "marked limitations in carrying out work like tasks with reasonable persistence and pace."  (Tr. 21; *see* Tr. 1228-29.)  The ALJ also cited Plaintiff's college experience, noting that he sat in the back and often needed to stand in class because of pain, had "trouble focusing both physically and mentally[,] and needed to withdraw from one of his classes."  (Tr. 21.)

The ALJ then found that Plaintiff had mild limitation in his ability to adapt and manage himself.  (Tr. 21.)  The ALJ noted that Plaintiff was able to care for himself, prepare his own meals, perform some household chores, and handle some outdoor chores.  (Tr. 21; *see* Tr. 279, 282, 291-92, 305.)  The ALJ also noted Dr. Trulsen's observations that Plaintiff was "well groomed, dressed appropriately, [had] good hygiene[, and] stated that [he] spends the day watching television, cleaning up the household and doing laundry/other tasks."  (Tr. 22; *see* Tr. 1225-26.)  The ALJ additionally noted Dr. Trulsen's observation that Plaintiff "expressed that he is able to do other chores but based on physical limitations, needs to take frequent breaks."  (Tr. 22; *see* Tr. 1226.)

In relevant part, the ALJ found and concluded that Plaintiff was capable of performing light work that was "limited to routine, repetitive 3-4 step tasks and corresponding stressors of a routine repetitive job); only brief and superficial contact with others . . . ; and with ordinary supervision."  (Tr. 22.)  When determining Plaintiff's residual functional capacity, the ALJ summarized the medical evidence related to Plaintiff's

mental-health impairments, specifically discussing Plaintiff's depression, anxiety, and suicidal ideation.  (Tr. 26-32.)  Among others, the ALJ summarized Plaintiff's treatment with Sundberg, Molstad, and Dr. Heggestad.  (Tr. 26-32.)

The ALJ did not find Plaintiff's subjective complaints to be wholly credible, concluding "the degree of severity alleged lacks support and consistency with the other evidence of record."  (Tr. 28.)  The ALJ noted that Plaintiff "was treated primarily with medication and therapy," and repeated examinations did not support Plaintiff's allegations. (Tr. 28.)  The ALJ also found that Plaintiff's daily activities were inconsistent with his allegations.  (Tr. 28.)  The ALJ reasoned that "[t]he limited degree of treatment required, daily activities, and relatively benign examinations belie allegations of disabling symptoms or functional limitations."  (Tr. 28.)  The ALJ further determined that the evidence in the record showed improvement in Plaintiff's conditions.  (Tr. 28.)

In considering the opinion evidence, the ALJ gave great weight to the opinions of the state agency psychological consultants.  (Tr. 29.)  The ALJ gave partial weight to Drs. Trulsen and Heggestad.  (Tr. 31-32.)  The ALJ gave no weight to Sundberg.[17]  (Tr. 31.)

### 5.  No Err in Considering Plaintiff's Mental Impairments

Plaintiff first argues that the ALJ disregarded his diagnoses of bipolar, adjustment, borderline personality, and anxiety disorders, considering only his depression.  The ALJ found and concluded that Plaintiff's depression was a severe impairment.  Plaintiff does not argue that his diagnoses of bipolar, adjustment, borderline personality, and anxiety

---

[17] The ALJ also gave no weight to Drs. MacLean and Seidelmann, who primarily treated Plaintiff in connection with his neck pain.  (Tr. 30-31.)  *See infra* Sections III.C.1, .2.a-b.  Drs. MacLean and Seidelmann both opined that Plaintiff was not able to work due to severe neck pain and bipolar disorder.  (Tr. 1238, 1239, 1552, 1553, 1579.)

disorders were severe impairments. Rather, Plaintiff argues that by "not identify[ing] [his] bipolar disorder, adjustment disorder, or anxiety disorder with the other allegedly non-severe medical conditions," there is no analysis as to why these other mental-health impairments were disregarded. (Pl.'s Mem. in Supp. at 10, ECF No. 12.) Essentially, Plaintiff appears to be arguing that the ALJ failed to account for any limitations resulting from these non-severe impairments when determining Plaintiff's residual functional capacity.

The Court begins by noting that the residual-functional-capacity determination is "an assessment of what [Plaintiff] can and cannot do, not what he does and does not suffer from." *Mitchell v. Astrue*, 256 F. App'x 770, 772 (6th Cir. 2007); *see Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (defining residual functional capacity as "the most a claimant can still do despite his or her physical or mental limitations" (quotation omitted)). A diagnosis alone is not sufficient. *See Perkins v. Astrue*, 648 F.3d 892, 899-900 (8th Cir. 2011); *Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011). The fact "[t]hat a claimant has medically-documented impairments does not perforce result in a finding of disability." *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004). Accordingly, the fact that the record contains evidence reflecting that Plaintiff has been diagnosed at one time or another with bipolar, adjustment, borderline personality, and anxiety disorders does not by itself demonstrate that the ALJ erred in this case.

When assessing a claimant's residual functional capacity, the ALJ is required to take into account "limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Policy Interpretation Ruling Titles II and XVI: Assessing*

*Residual Functional Capacity in Initial Claims*, SSR 96–8p, 1996 WL 374184, at *5 (Soc. Sec. July 2, 1996) [hereinafter SSR 96–8p]; *see* 20 C.F.R. § 404.1545(a)(2) (considering all medically determinable impairments including those that are not "severe"). As such, a claimant's residual functional capacity represents "the most that []he was capable of doing despite the combined effects of both h[is] severe and non-severe medically determinable impairments." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).

First, Plaintiff has not claimed any increased functional limitations resulting from his bipolar, adjustment, borderline personality, and anxiety disorders. *See Stormo*, 377 F.3d at 807 ("It is appropriate for the ALJ to take a 'functional approach' when determining whether impairments amount to a disability." (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987))). Plaintiff has not identified how the alleged failure to consider these diagnoses impacted the ALJ's findings and conclusions with respect to his residual functional capacity and any mental limitations. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, Byes must provide some indication that the ALJ would have decided differently if the error had not occurred."). It is Plaintiff's burden to prove his residual functional capacity. *See Perks*, 687 F.3d at 1092; *Vossen*, 612 F.3d at 1016. As the Commissioner points out, "Plaintiff has not identified, much less proven, additional mental limitations." (Def.'s Mem. in Supp. at 8, ECF No. 14.)

Second, the ALJ's discussion of the medical evidence reflects that Plaintiff's bipolar, adjustment, borderline personality, and anxiety disorders were not disregarded. The ALJ chronicled Plaintiff's treatment with a number of mental-health providers, specifically referencing treatment notes referring to Plaintiff's anxiety. The ALJ expressly

included Plaintiff's bipolar disorder when discussing the opinion evidence.  The ALJ also discussed Plaintiff's treatment with and the opinions of Sundberg and Dr. Heggestad, among others, who referenced Plaintiff's adjustment, anxiety, and bipolar disorders.  Dr. Heggestad had included Plaintiff's borderline personality disorder in his opinion as well. Dr. Trulsen's opinion, which was also expressly considered by the ALJ, similarly included adjustment and anxiety diagnoses.

"[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."  *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); *see also, e.g.*, *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ is "not required to provide an in-depth analysis on each piece of evidence").  Based on the ALJ's discussion of medical evidence directly implicating the diagnoses Plaintiff contends were disregarded, it is highly unlikely that these diagnoses were not also taken into account by the ALJ when considering the evidence in the record. This is particularly true when Plaintiff has not articulated how these diagnoses result in greater limitations and thus a more restrictive functional capacity than determined by the ALJ.  This is even more true where, as here, Plaintiff does not take issue with the ALJ's weighing of the opinion evidence regarding his mental health impairments—opinions which specifically addressed his bipolar, adjustment, borderline personality, and anxiety disorders along with his depression.

In sum, while Plaintiff contends that the ALJ disregarded his bipolar, adjustment, borderline personality, and anxiety disorders, Plaintiff has not claimed, let alone shown, that these impairments result in greater mental limitations than determined by the ALJ

when assessing Plaintiff's residual functional capacity.  The ALJ's detailed discussion of Plaintiff's mental-health treatment and the evidence in the record demonstrate that these non-severe impairments and any accompanying symptoms were properly taken into account and considered, even if each impairment was not expressly addressed in the ALJ's decision.

### C. Light Work with Frequent Bilateral Overhead Reaching

#### 1. Medical Evidence

Prior to the alleged period of disability, Plaintiff underwent neck surgery for a spinal fusion to address persistent cervical pain stemming from a 2009 work injury.  (Tr. 364-67, 417; *see* Tr. 372-88, Tr. 560-63; *see also* Tr. 950-66, 1118-30, 1555-66, 1639, 1673.)  Plaintiff was released to work following surgery with a recommendation that he avoid lifting more than 50 pounds daily on a repetitive basis and "repetitive overheard work environments."  (Tr. 371.)

Plaintiff also has a history of surgery involving his left forearm.  (Tr. 380.)  Plaintiff had previously fractured his left forearm twice.  (Tr. 389, 423, 603, 948, 1115.)  Each time, the bones were set with plates.  (Tr. 389, 603; *see* Tr. 398, 948.)  Over time, some of the hardware had become "prominent and [was] irritating for him and symptomatic."  (Tr. 389; *see* Tr. 542, 948.)  In April 2013, Plaintiff underwent surgery to remove the symptomatic hardware. (Tr. 389-90; *see* Tr. 463-67, 948-50.)  Plaintiff "had some good relief" with the hardware removal and was "doing very well" following surgery.  (Tr. 462.)

Plaintiff continued to present to the emergency room and urgent care with complaints of neck pain following his neck surgery.  (*See, e.g.*, Tr. 471-537, 542-47, 550-

57; *see also* Tr. 925-27, 944-46, 1092, 1088, 1111-1574, 1648, 1652, 1657, 1660, 1663, 1667, 1670.)  Plaintiff often reported increased pain after engaging in physical activities, such as yard work, including snow-blowing and shoveling, and work around the house, including laying carpet and moving furniture.  (*See, e.g.*, Tr. 493, 513, 518, 520, 522, 524, 532, 535, 537, 546, 942; *see also* Tr. 479 (increased pain after starting a new janitorial services job where "he has been vacuuming and mopping more than usual"), 921 (same), 1088 (same), 481 (increased pain after "carrying groceries"), 487 (increased pain after "play[ing] with his new dog, which is a pit bull").  On at least one occasion, Plaintiff reported "some pain radiating down his left arm which is not new for him."  (Tr. 546.) Occasionally, Plaintiff was noted to have some muscle spasm.  (*See, e.g.*, Tr. 488, 492; *see also* Tr. 483, 481, 1650-51, 1652.)

Physical examinations generally showed normal strength and sensation in his upper limbs without weakness, numbness, or tingling.  (*See, e.g.*, Tr. 476, 500, 511, 513-14, 516, 518, 520, 524, 527-28, 533, 535-37, 542-45, 547, 550-54, 556, 926, 1572, 1094; *see also* Tr. 475, 479, 481, 500, 504, 548-49, 1655, 1659, 1665, 1668, 1670-72; *cf.* Tr. 473 (chronic "intermittent numbness and tingling down into his left hand" occurring more frequently following motor vehicle accident), 515 ("some numbness in the tips of his second and third fingers of his left hand, but this is chronic as well"), 526 ("a little bit of chronic tingling that occurs in his left hand but nothing new"), 528 ("occasional numbness in his thumb, index and ring finger"), 551 ("a small amount of described numbness over the radial aspect of his dorsal left hand"), 945 ("[s]ome tingling/numbness in 1st 3 fingers of left hand"), 1112 (same).  Plaintiff was most frequently treated with trigger point injections and

Toradol injections[18] among other medications.  (*See, e.g.*, Tr. 471, 474, 476, 480, 482, 484, 486, 488, 492, 494, 497, 500, 503, 505, 508, 510, 512, 514, 516, 519, 521-22, 524, 528, 531, 533, 536-37, 543, 545, 547, 549, 551, 554, 556, 922, 926, 946, 1090, 1094, 1114, 1648, 1657, 1660, 1665, 1669, 1672.)

While Plaintiff was hospitalized in October 2013 for suicidal thoughts, it was noted that "he became quite upset and threw his arms up and around," moving both "arms symmetrically and with force in good [range of motion]."  (Tr. 412.)

Around this same time, Plaintiff sought to establish care with a new primary treatment provider, Lynn T. MacLean, MD, to address his chronic pain.  (*See, e.g.*, Tr. 738, 921-22, 939-40, 942-43, 1110.)  Dr. MacLean prescribed different pain regimens, including tramadol, nabumetone,[19] and Lyrica.  (Tr. 737, 740, 940, 944, 1111.)

Throughout 2014, Plaintiff continued to seek treatment for chronic pain primarily with Dr. MacLean and through the pain clinic.  (*See, e.g.*, Tr. 622-30, 635-37, 644, 647-49, 660, 663, 668-69, 672, 675, 678, 681, 685, 688, 694, 697, 850-51, 855-57, 869-77, 879-81, 891-92, 887-88, 895, 897-901, 907-08, 910-911, 913-14, 1023-24, 1037-43, 1046-49, 1055-56, 1058-59, 1062-66, 1068-72, 1075-79, 1081-82, 1197-98; *see also* Tr. 982-83, 1082, 1217, 1641, 1725, 1727, 1729, 1732.)  Treatment notes occasionally mention radiating pain in Plaintiff's left arm, chronic numbness in some of his fingers, and slight

---

[18] Toradol is the brand name for a ketorolac injection, a medication used to treat "moderately severe pain." *Ketorolac Injection*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a614011 html (last visited Jan. 3, 2019).

[19] "Nabumetone is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis . . . and rheumatoid arthritis."  *Nambumetone*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a692022 html (last visited Jan. 3, 2019).

tremors.  (*See, e.g.*, Tr. 625-26, 628, 647-48, 686, 716, 856, 881, 895, 900-01, 907, 1024, 1041, 1039, 1048, 1075, 1641.)

In March 2014, Dr. MacLean noted "findings of benzodiazepine and codeine" in a "tox screen."  (Tr. 681; *accord* Tr. 902, 1070.)  Plaintiff admitted to purchasing these medications online.  (Tr. 681, 902, 1070.)  Dr. MacLean "[d]iscussed [the] risks of taking non-prescribed medication and [the] fact that tramadol . . . is also addictive and due to this finding will no longer be prescribed by this office."  (Tr. 681; *accord* Tr. 684, 902, 1070.)

Plaintiff received different types of injections with the pain clinic, including steroid epidural injections, trigger point injections, and Botox injections.  (*See, e.g.*, Tr. 626, 629, 635-37, 648, 660, 668-69, 672, 678, 685, 850-51, 856-57, 872, 874, 881, 888, 891-92, 895, 901, 908, 1023-24, 1039, 1041, 1048-49, 1055, 1059, 1063, 1068-69; 1075, 1197-98; *see also* Tr. 911, 982-83, 1056, 1079, 1082, 1217, 1726, 1728, 1730, 1733.)  With some of the injections, Plaintiff reported significant improvement.  (*See, e.g.*, Tr. 672 ("He has again noted significant improvement of his left upper extremity radicular symptoms.  He is now over 80% improved with those injections."), 895 (same), 1063 (same), 678 ("He noted 75% relief of his upper extremity radicular symptoms with that injection.  Symptoms have returned slightly, yet he remains 50% improved."), 1068 (same); *see also* Tr. 625, 636, 850, 856, 872-73, 878, 881, 888, 900-01, 982, 1021, 1023-24, 1045, 1048, 1055, 1062, 1070, 1074-75, 1195, 1197.  *But see* Tr. 668 ("He noted about 20% relief of the pain symptoms with that injection overall."), 891 (same), 1058 (same).)

Between March and August 2014, Plaintiff attended physical therapy to treat complaints of neck pain and muscle spasms.  (Tr. 571-604.)  Plaintiff also reported

numbness and tingling in his left upper extremity and fingers.  (Tr. 571, 603 .)  Plaintiff again reported increased symptoms with increased activity and following a car accident. (*See, e.g.*, Tr. 575, 577, 595, 599.)  Plaintiff also generally reported some pain relief from the injections. (Tr. 575, 577, 591, 599. *But see* Tr. 597.)  Plaintiff reported "feel[ing] better with physical therapy intervention."  (Tr. 581; *see* Tr. 583, 585, 587, 591, 593, 595, 597, 599.)

In June 2014, Plaintiff underwent a second surgery to remove additional "symptomatic hardware" in his left forearm, which was causing "tendinitis type symptoms" and "soft tissue irritation." (Tr. 423-24, 447; *see* Tr. 425-47, 450-60, 589, 653-58, 883-87.)  During a physical examination before the surgery, Plaintiff "describe[d] intermittently some paresthesias in the ulnar side of his left hand, but just intermittently compatible with mild cubital tunnel syndrome." (Tr. 459.)  Following a nerve conduction study, Plaintiff was diagnosed with "mild cubital tunnel syndrome," which "has been intermittent and relatively mild." (Tr. 459; *see also* Tr. 1577.)  As "there was no evidence that the nerve is being permanently injured," it was recommended that Plaintiff "avoid 'leaning on [his] elbows' or placing [his] elbow on objects to reduce the pressure on the nerve in this region." (Tr. 1577.)  Plaintiff was "doing very well" following the surgery. (Tr. 451; *see* Tr. 644, 879.)  Plaintiff's left arm generally "felt 'better'" although he still reported weakness in his arm and experienced occasional intermittent numbness and tingling in his hand. (Tr. 603.)

Towards the end of September and into October, Plaintiff was evaluated for participation in a pain program at the request of Dr. MacLean. (Tr. 612-21, 833-36, 864-

69, 1206-11, 1034-36.)  In addition to his history of neck pain, Plaintiff reported increased pain down his left arm following a motor vehicle accident in August.  (Tr. 613, 865, 867, 1207, 1209, 1035.)  Along with the Lyrica prescribed by Dr. MacLean, Plaintiff reported "get[ting] Valium and Tylenol with Codeine from an unknown provider in the United Kingdom."  (Tr. 613; *accord* Tr. 867, 1209, 1035.)  Plaintiff reported that "painkillers give him moderate relief from pain"; "[h]e can look after himself normally without causing extra pain"; and, while "[p]ain prevents him from lifting heavy weights, . . . he can manage light to medium weights."  (Tr. 614; *accord* Tr. 868, 1210, 1035; *see* Tr. 618.)

In connection with the evaluation, Plaintiff was diagnosed with "depression and adjustment disorder with [a] depressed mood . . . reflecting the impact of pain in the sense of loss on his lifestyle."  (Tr. 619.)  Plaintiff's prior diagnosis of borderline personality disorder was also recognized.  (Tr. 619.)  "[P]sycholog[ical] intervention . . . consist[ing] of instruction in self-management techniques for managing and controlling pain" was recommended.  (Tr. 619.)

Upon physical examination, Plaintiff was noted to have full strength in his upper extremities.  (Tr. 615, 868, 1210, 1036.)  Plaintiff could lift 25 pounds from the floor to his waist and from his waist over his head.  (Tr. 865, 835, 1033, 1207.)  Plaintiff's range of motion in his upper extremities was "within functional limits" but showed weakness.  (Tr. 834; *accord* Tr. 865, 1033, 1207.)  Overall, Plaintiff "demonstrate[d] significant weakness for posture, deconditioning, and lack of flexibility."  (Tr. 835; *accord* Tr. 866, 1033, 1207.)

Plaintiff participated in six sessions of physical therapy and four sessions of occupational therapy in connection with the pain program.  (Tr. 840, 843-47, 849-52, 854-

55, 1005-07, 1011-14, 1016-17, 1019, 1022, 1173, 1176, 1181, 1185-86, 1188-89, 1191, 1193, 1196.)   Plaintiff reported that his pain increased with activities such as "long durations and repetition of a certain activity, standing too long, sitting too long, laundry, vacuuming, emptying the dishwasher, doing yard work, mowing the lawn, snow-blowing the driveway, any type of car maintenance and changing the oil."  (Tr. 1186; *accord* Tr. 845, 1012.)  Plaintiff typically rated his pain at 6 out of 10 and reported at least temporarily relief with physical therapy.  (Tr. 840, 843, 846, 849, 852, 854, 1007, 1011, 1014, 1017, 1019, 1022, 1181, 1185, 1188, 1191, 1193.)

Plaintiff continued seeking treatment for neck pain and associated symptoms in 2015, including through Dr. MacLean, the pain clinic, the emergency room, and urgent care.  (*See, e.g.*, Tr. 847-49, 1014-18, 1188-93, 1388-89, 1400-1402, 1422-23, 1433-37, 1460-65, 1486-87, 1491-92, 1494, 1719, 1721, 1723; *see also* Tr. 1232-33.)  Plaintiff once presented to the emergency room following an "episode of severe muscle spasms" involving "uncontrollable full body muscle spasms and jerking."  (Tr. 1712.)  Plaintiff continued to receive epidural steroid, trigger point, and Botox injections through the pain clinic, and generally experienced at least some relief as a result of these treatments.  (*See, e.g.*, Tr. 1017-18, 1172, 1388, 1417, 1422-23, 1486, 1491, 1494-95; *see* Tr. 1400, 1722.)  Treatment notes occasionally referred to numbness on Plaintiff's left side "in the distribution of his usual symptoms."  (Tr. 1495; *see* Tr. 1474, 1469; *see also* Tr. 1232 (complaints of left wrist pain).)  During this time, Plaintiff also continued to self-medicate with medications he purchased online despite warnings from his treatment providers.  (*See, e.g.*, Tr. 1429-30, 1432, 1436, 1462, 1470, 1472, 1476, 1482; *see also* Tr. 1175.)

Plaintiff also consulted with neurology concerning his complaints of "neck spasm, jerkiness, [and] particular numbness of the middle fingers of the left hand and intermittently of the right." (Tr. 1491; *see* Tr. 1400; *see also* Tr. 863-64, 1030-31, 1149-50, 1204-05.) Strength and range of motion in his upper extremities continued to be within normal limits. (Tr. 1491; *see* Tr. 1401.) Imaging studies showed Plaintiff's spinal fusion was stable with mild disk impingement and there was no cord abnormality. (Tr. 1492; *see* Tr. 1537-38.)

Plaintiff continued to pursue a similar course of treatment for his neck pain in 2016. (*See, e.g.*, Tr. 1259-61, 1270-71, 1287-88, 1299-1301, 1331-32, 1334-39, 1341-42, 1346, 1354-60, 1362-63, 1365, 1373-79, 1626-31, 1677, 1681, 1689.) For a period of time, Plaintiff continued to received epidural steroid, trigger point, and Botox injections from the pain clinic, reporting improvement after these treatments. (Tr. 1354-55, 1365, 1378; *see also* Tr. 1259-61, 1287-88.) On occasion, neck spasms were noted. (*See, e.g.*, Tr. 1270-71, 1287; *see also* Tr. 1269.) Plaintiff denied upper extremity weakness and numbness and had normal strength and reflexes. (Tr. 1346-47, 1677, 1682, 1686; *see* Tr. 1332.) Plaintiff's sensation was grossly intact. (Tr. 1347; *see* Tr. 1677.)

In early April, however, Plaintiff was discharged from the pain clinic after he was he was discovered taking medications from the "procedure area." (Tr. 1341-42; *see* 1334.)

Plaintiff had additional hardware removed from his left arm in November to address complaints of pain in his left wrist. (Tr. 1594-95; *see* Tr. 1261-68, 1583-93, 1596.) Plaintiff was doing well following surgery. (Tr. 1582. *But see* Tr. 1626, 1631 (scar opened).) During an appointment approximately six weeks later, Plaintiff's neurologist

noted that Plaintiff "remarkably had improvement in his ability to extend his fingers down at his side," and "was able to use the fingers immediately" following surgery. (Tr. 1620.)

At the end of November, Plaintiff began a course of physical therapy. (*See, e.g.*, Tr. 1250-53.) During the initial evaluation, Plaintiff reported that "[h]e has been given instructions . . . [for] no overhead lift[ing]/reaching." (Tr. 1251.) It was noted that he had full range of motion in his upper extremities. (Tr. 1251.) Plaintiff's program was to focus on cervical strengthening and self-management of pain for improved functioning. (Tr. 1252.) Plaintiff had an additional eight sessions of physical therapy. (Tr. 1604, 1609, 1611, 1613, 1621, 1624, 1633, 1636.) Plaintiff was generally doing well and rated his pain at 5 out of 10. (Tr. 1611, 1613, 1621, 1624, 1633, 1636.)

Plaintiff was seen in neurology in early January 2017. (Tr. 1619-20.) Plaintiff was noted to be "doing very well." (Tr. 1619.) The neurologist observed: "His grasp was normal. Indicis proprius activity and extension of the index finger shows minimal weakness in the left versus the right. Adductions were 5/5 and symmetrical, as was apposition and bicipital reflex intact." (Tr. 1620.) Plaintiff's muscle spasms were responding well to the Botox injections and another injection was scheduled for March. (Tr. 1620.)

### 2.  Opinion Evidence

#### a.  Dr. MacLean

Dr. MacLean completed four Medical Opinion forms: December 2014, May 2015, October 2015, and April 2016. (Tr. 1238, 1239, 1552, 1553.) Each time, she indicated that Plaintiff was not able to work in the foreseeable future based on his severe neck pain

and bipolar disorder.  (Tr. 1238, 1239, 1552, 1553.)  Dr. MacLean opined that Plaintiff was permanently restricted from lifting more than 20 pounds.  (Tr. 1238, 1239, 1553.)

### b.  Dr. Seidelmann

In May 2014, T. Mark Seidelmann, M.D., the doctor who primarily treated Plaintiff in the pain clinic, completed a Medical Opinion form.  (Tr. 1579; *see, e.g.*, Tr. 626, 660, 668-69, 672, 678, 685, 1341-42, 1354-55, 1365, 1378, 1388, 1417, 1489, 1494-95.)  Like Dr. MacLean, Dr. Seidelmann also opined that Plaintiff was not able to work in the foreseeable future based on his severe neck pain and bipolar disorder, among other things.  (Tr. 1579.)  Dr. Seidelmann similarly opined that Plaintiff be restricted to lifting no more than 20 pounds except for "rare occasion[s]."  (Tr. 1579.)

### c.  State Agency Medical Consultants

In relevant part, the state agency medical consultants opined on Plaintiff's exertional and manipulative limitations.  (Tr. 89-90, 105-07.)  Plaintiff was able to lift 20 pounds occasionally and 10 pounds frequently.  (Tr. 89, 105-06.)  While Plaintiff was limited in his ability to reach overhead with both arms based on his ongoing neck pain, he was capable of performing "[f]requent overhead work."  (Tr. 90; *accord* Tr. 107.)  Plaintiff was otherwise unlimited in his abilities to handle, finger, and feel.  (Tr. 90, 107.)

### 3.  Plaintiff's Testimony

As stated above, Plaintiff testified that he is able to feed and care for himself, and volunteered at the boarding lodge for an hour serving and cleaning in the kitchen.  (Tr. 48, 53.)  Plaintiff testified that he had no problems driving.  (Tr. 49.)

Plaintiff was also asked about tremors in his hands and arms. (Tr. 70-71.) Plaintiff testified that he "can always just kind of feel them wanting to underneath the skin," and that trying to resist them sometimes made things worse. (Tr. 71.) Plaintiff further testified that these tremors were accompanied by muscle spasms. (Tr. 71.) When asked if the tremors in his arms and hands affect his ability to perform activities with his hands, Plaintiff testified, "I don't believe so." (Tr. 71.)

Plaintiff testified that the last hardware removal surgery was very helpful. (Tr. 56-57.) Plaintiff stated that his pain had gone back to baseline, which "is very mild but it's there especially in cold weather." (Tr. 57.) Plaintiff also testified that he was partially limited in the use of his left arm. (Tr. 57.) Plaintiff's "finger movement is fine but extending [his arm] further up or down it's partially limited to what it was." (Tr. 57.) Plaintiff also testified that stress impacted his pain. (Tr. 65.)

Plaintiff additionally testified that, when he lived at home with his parents, he helped with chores like laundry and assisted his father with repairs around the house. (Tr. 54, 58.) When asked about when he worked part-time as a school custodian, Plaintiff testified that he was given additional time to perform tasks at his own pace. (Tr. 68-69; *see* Tr. 245, 280.)

### 4. ALJ Decision

In relevant part, the ALJ found and concluded that Plaintiff was capable of performing light work with no more than frequent performance of tasks overhead bilaterally. (Tr. 22.) When determining Plaintiff's residual functional capacity, the ALJ summarized the medical evidence related to Plaintiff's chronic neck pain (including his

fusion surgery), exacerbations of pain following increased activity, repeated injections, and treatment for left-wrist pain.  (Tr. 22-26.)

As stated above, the ALJ determined that Plaintiff's subjective complaints were not wholly credible and the alleged limitations not consistent with other evidence in the record. The ALJ noted that Plaintiff's course of treatment was not consistent with what "one would expect for the disabling symptoms and limitations alleged," and "repeated physical . . . examinations did not support the alleged disabling symptoms and limitations."  (Tr. 28.) The ALJ also observed that Plaintiff experienced improvement with treatment.  (Tr. 28.) The ALJ additionally noted that Plaintiff's daily activities were not "limited to the extent one would expect[] given the complaints of disabling symptoms and limitations."  (Tr. 28.) The ALJ also noted Plaintiff's self-report that "he was unable to lift 50 pounds" and his hearing testimony that he assisted with serving and cleaning up at the boarding facility and was able to drive.  (Tr. 23; *see* Tr. 280 ("I am unable to lift 50 pounds . . . ."), 284 ("The most I can lift with both hands is 25 pounds [without] hurting after.").)  The ALJ gave no weight to the opinions of Drs. Seidelmann and MacLean, who opined that Plaintiff was unable to work due to his neck pain.  (Tr. 30-31.)

### 5.  No Err in Assessing Plaintiff's Physical Residual Functional Capacity

Plaintiff argues that "[s]ubstantial evidence in the record does not support [the ALJ's] finding that [he] is capable of performing light work with only frequent overhead bilateral tasks."  (Pl.'s Mem. in Supp. at 11.)  Plaintiff argues that the ALJ did not consider the impact his tremors and other involuntary movements (such as myoclonic jerks, muscle spasms and twitches) "have on his ability to use his upper extremities and hands."  (Pl.'s

Mem. in Supp. at 11.)  Plaintiff also argues that the ALJ did not take into account his cubital tunnel syndrome, repeated surgeries on his left arm, and ongoing pain.

Beginning with Plaintiff's tremors and other involuntary movements, this topic was specifically covered at the hearing before the ALJ.  Plaintiff was asked if the "spasms and twitches in [his] hands and arms affect [his] ability to perform any activities with his hands." (Tr. 71.)  Plaintiff responded, "I don't believe so." (Tr. 71.)  It is true that the ALJ did not discuss Plaintiff's tremors and other involuntary movements.  But, Plaintiff himself testified that they did not significantly limit his ability to use his hands.  And, Plaintiff has not pointed to any medical evidence in the record demonstrating that his tremors and other involuntary movements limit his ability to use his hands.  Considering the exchange at the hearing, the infrequent references to such movements in the medical record, and the objective medical evidence showing that Plaintiff's strength, sensation, and range of motion in his upper extremities were generally within normal limits, the ALJ did not err in declining to discuss specifically Plaintiff's tremors and other involuntary movements.  *See Renstrom*, 680 F.3d at 1065; *Craig*, 212 F.3d at 436.

As for Plaintiff's cubital tunnel syndrome, Plaintiff was diagnosed with *mild* cubital tunnel syndrome in 2014 and it was recommended that he avoid leaning on his elbows or placing his elbows on objects in order to reduce pressure on the nerve.  Again, as stated above, a diagnosis alone is insufficient.  Plaintiff has not specifically articulated how the alleged failure to consider his cubital tunnel syndrome impacted the ALJ's findings and conclusions with respect to Plaintiff's residual functional capacity.  Plaintiff has not claimed, for example, that the ALJ should have incorporated some sort of limitation into

the residual-functional-capacity determination with respect to Plaintiff's elbows. Similarly, Plaintiff has not pointed to any medical evidence in the record demonstrating that his cubital tunnel syndrome significantly limited his ability to use his hands.

Moreover, substantial evidence in the record supports the ALJ's determination that Plaintiff is capable of performing light work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). All of the opinion evidence, even the opinions that the ALJ disregarded, limited Plaintiff to lifting no more than 20 pounds. This range is also within Plaintiff's own descriptions of his lifting limitations. The state agency medical consultants also both opined that Plaintiff should be limited to no more than frequent overhead work, and the ALJ incorporated this limitation into the residual functional capacity. Plaintiff testified that extension of his arm is "partially limited." (Tr. 57.) Again, Plaintiff has not pointed to medical evidence in the record to support greater restrictions.

Similarly, Plaintiff contends that the ALJ did not take into account his pain and the time he spent recovering from his left-arm surgeries. Yet, Plaintiff does not challenge the ALJ's determination that his subjective complaints were not wholly credible. "While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability." *Perkins*, 648 F.3d at 900 (quotation omitted); *accord Craig*, 212 F.3d at 436. The ALJ observed, and the evidence in the record shows, that Plaintiff engaged in a number of activities that were inconsistent with his allegations of disability, including shoveling snow, moving furniture, driving, going to the store, mowing the lawn,

doing laundry, and volunteering with food service and clean up at his boarding facility. It is well settled that "acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Halverson*, 600 F.3d at 932 (quotation omitted); *see, e.g.*, *Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015); *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009); *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001).

And, as the ALJ observed and the evidence in the record shows, Plaintiff's pain improved with treatment. *See Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) ("We do not consider impairments controllable by treatment or medication to be disabling."); *see also Renstrom*, 680 F.3d at 1066 ("The ALJ proceeded to discuss how Renstrom improved with treatment, including physical therapy, a TENS unit, and pain medications, which showed Renstrom's level of pain was controllable."). While Plaintiff did not experience complete relief from treatment, he often reported that the injections he received were helpful and benefited from physical therapy. Plaintiff was doing well after each of his arm surgeries. At the hearing, Plaintiff testified that his latest surgery was very helpful and described the pain in his arm as "very mild." (Tr. 57.)

In essence, Plaintiff has relied on a diagnosis without evidence of corresponding functional limitations and his own subjective complaints to argue that the ALJ erred in determining he was capable of performing light work with no more than frequent overhead tasks bilaterally. Plaintiff has not pointed to any medical evidence demonstrating greater physical limitations in his upper extremities than determined by the ALJ. Plaintiff has not challenged the weighing of the opinion evidence. Nor has Plaintiff challenged the ALJ's determination that his subject complaints were not wholly credible. The ALJ considered

the recorded as a whole, evaluating Plaintiff's subjective complaints alongside the other evidence, including the medical evidence, Plaintiff's activities, and Plaintiff's own descriptions of his limitations.  There is substantial evidence in the record as a whole to support the ALJ's conclusion that Plaintiff was capable of performing light work with no more than frequent overhead tasks bilaterally.

## IV. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **DENIED** and the Commissioner's Motion for Summary Judgment (ECF No. 13) be **GRANTED**.

Dated: January   23   , 2019                              *s/ Tony N. Leung*
                                                          Tony N. Leung
                                                          United States Magistrate Judge
                                                          District of Minnesota

                                                          *Tyler M. J. v. Berryhill*
                                                          Case No. 18-cv-537 (JRT/TNL)

### NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).